Before proceeding, though, I want to recognize U.S. District Court Judge Lee Rosenthal, who sits in the Southern District of Texas, based out of Houston, Texas. And Judge Schwartz and I want to thank you very much for joining us and helping us out this week. It's a great pleasure. Thank you. Good morning, and may it please the Court, my name is Peter Goldberger. It's my privilege this morning to represent Abdir Tai, who was the defendant below, and of course the appellant here. Best to reserve two minutes for rebuttal. Dr. Tai, as you know, was convicted and sentenced to six years in prison for submitting false or exaggerated certifications of valvular heart disease to the Class Action Settlement Fund in the Fen-Phen litigation. He is a cardiologist, 80 years old, from Florida. His defense at trial was that he did not know or intend to submit any false certifications. The case went to trial on that issue, and of course he was convicted. We have one issue arising out of the trial and three somewhat interrelated issues concerning the sentencing, all having to do with sentencing guidelines, calculations. So before I proceed, I do want to introduce at council table my co-counsel for this appeal, Norris Gelman, very distinguished Pennsylvania appellate lawyer, and it's a pleasure to work with him on any case. So before I turn to the sentencing issues, briefly on the jury instructions, unless of course you want to spend more time on it, the willful blindness instruction concerns a particular way of proving the knowledge element, which of course was the contested element at trial. Can I ask you a question on that, since this is a commonly used instruction, and the way that it was given followed the commonly used way in that it's given, as far as I can tell? Well, I think it's a little premature to say commonly, because these so-called model instructions for the Third Circuit are only a few years old. Well, they are not that different from the model instructions or the pattern instructions that I've seen in other places as well. Yes. But even putting that aside, there are lots and lots of references throughout the instructions that emphasize the jury's obligation to make all the findings beyond a reasonable doubt. And given our obligation to read the instructions as a whole, how do you address the prevalence of that language throughout the instructions? Of course, throughout the instructions, the jury is told that it must find all of the findings, certainly not all the findings that a jury might make, even in a criminal case have to be made beyond a reasonable doubt. What the jury has to understand is which ones are elements, and that those must be found beyond a reasonable doubt. And yes, as we said in the brief, there are many places where the instruction is given in general. But this instruction is given as a special circumstance. It's given as an unusual rule. It's an unusual way of proving an element. It's not an element, but a way of proving an element. And the jury has to understand that it's not an affirmative defense, not that they would know that terminology, but that it's nothing like an affirmative defense, but rather merely a way of proving. I'm sorry. I was going to say a similar instruction was given in United States v. Flores, which you may be familiar with. Yes. Even before the instructions, model instructions. Yeah. And we approved an almost identical instruction there. So why is it that? Not against this challenge. I don't think the point was made. The argument wasn't made there. And of course, this Court's precedents stand for the proposition decided on the issues presented in which the Court states it's decided. Tell me about the model jury instruction, because it is a model. It's been used for quite some time. I mean, there is a process involved in approving those jury instructions, including, I think, opportunity to comment on those instructions. Yes. But both the prosecution and the defense bar. But it's very important that the instructions are not approved by the Court, and that's the first statement in the introduction to the manual, and that they are always open to challenge in a particular case when an error appears, when it appears that there is an error, even in the model instruction phraseology. They don't carry any special weight, if that's the suggestion behind your question, that there's some kind of presumption that they're correct, because they're put together by what is, in fact, a fine committee. The committee has dozens of things to look at, and they're going to miss some. More to Judge Rosenthal's point, though, it seemed like the landscape was littered with comments to the jury to find each and every element beyond the reasonable doubt, time and time again. Yes. You don't think that that was sufficient to instruct the jury that? No, because when the jury is told, as it was in this case, if you find this and if you find that, three things, which appear to occupy the field of possibilities other than knowledge, a space of mind other than knowledge. They're basically ways of explaining to lay people what is recklessness, what is negligence, what is ignorance, the three states of mind other than knowledge. If you find one of those, then you may not find, must not find, willful blindness. This contrasts very sharply to what the jury was told about good faith, which is the other special instruction they received about a state of mind that would negate the element of knowledge. In that instruction, which was also the model instruction, it says, if you have a reasonable doubt that these circumstances may exist which are inconsistent with the element, then you must not find the element. And here, by mistake, the committee overlooked that and said, if you find. If you find, suggest to the jury a burden of proof, probably a preponderance sort of burden if the jury is thinking in those terms. But we assume that juries follow instructions, understand the distinctions that are being made by judges, and the standard is a reasonable probability that the jury was misled. But here the language as delivered first reads, as I just explained referring to the district court, the government must prove beyond a reasonable doubt that Dr. Tai knowingly devised the scheme. That's the element. The next, then, the next sentence says both of these elements involve the knowledge of inaccuracy. Yes. Specific to your case. It then continues, when, as in this case, knowledge of a particular fact or circumstance is an essential part of the offense charge, the government may prove that Dr. Tai knew of the fact and circumstance if the evidence proved beyond a reasonable doubt of deliberate closing of the eyes. So putting aside the model charge, let's talk about the charge that's delivered. This squarely puts that burden of proof on the government. Right up to there. So I don't see how this in any way implicitly makes a shift when it explicitly places that burden squarely on the government. None of that language places the burden wrong. It's the language which follows it, which then gives three instances, which the government and I say occupy the field of alternatives that say if you find, if you find, if you find. But there's no, like, is there any reference to any standard of proof other than beyond a reasonable doubt? Not expressly. It's implied. The word preponderance doesn't appear. It's implied, and that's why the reasonable probability standard applies. You do have two other. Yes. So let me turn to the sentencing questions also, because even at this, at a six, about a six-year sentence, every two levels is about a year in prison. So this makes a big difference. It makes a big difference to Dr. Tai that he received four levels of increase to his sentence based on role and other, another Chapter 3 adjustment. Let me start with 3B1.3, which is the abuse of a position of trust or misuse of a special skill. May I ask one question about this? Yes. In the abuse of a position of trust, you argue, as I understand it, that the audit requirement is inconsistent with finding a position of trust. That's one of the circumstances that we point to and rely on heavily, yes. The, as I understand the facts, though, and the government makes this point strongly, and most of the time that Dr. Tai was submitting the reports, there was only a 10% or 15% audit requirement. The 100% requirement didn't come into effect until, I think, 85% of his submissions had been completed. How does that, how does that relaxed amount of auditing square with the argument you're making? It's 10% by one group and five by another, and I think we've agreed that it's really cumulatively a 15% audit rate was built into the program. Fine. It's not 100%. And we say, not that every claim was going to, it doesn't have to be that every claim would be audited, but that the existence of a random audit and a random chance of audit shows that the, confirms that the doctors in this situation were, as we say, were working for the plaintiff's lawyers. They were not working for the trust, for the settlement trust. And I have to say, whenever we talk about abusive position of trust, it's confusing when the victim has the word trust in their name, right? But there's no trust relationship between Dr. Tai and the other cardiologists who were hired to submit reports on behalf of the plaintiff's lawyers to the trust for payment. No trust relationship between them and the settlement funds. I'm sorry, say that again. Isn't there a relationship, a trust relationship between Dr. Tai and, I guess it was a panel that was screening the echocardiograms that he was submitting? No. His relationship is fiduciary type relationship. His trust relationship is with the lawyers who hired him. And with the patients or claimants. He was reading echocardiograms and he was signing off on them. Yes. At the rate of something like 4,000 in a three and a half year period. Yes. It was really rubber stamping these things. Yes. But they were relying on those reports to determine how much money the victims were going to get. So, they were trusting, it seemed to me, what he was saying because he was a physician, he was board certified, he fit all the qualifications, doesn't that create a trust relationship? No. And that's the other most common confusion under this unfortunately named rule in the guidelines. Because the fact that the victim was overly trusting of the perpetrator does not create a trust relationship of the kind that's talked about in the guidelines. Let's use the most similar example, the DeMuro case from a couple of years ago in this court where the employers failed to deposit funds after being ordered to do so in a trust fund account required of them by the IRS. These are trust fund taxes, social security taxes. It has all the same confusions. The IRS trusts taxpayers to comply with the tax law. We have, as they say, a voluntary compliance system. And yet, this court reversed the adjustment in that case very similar to this one because that is not the kind of relationship that the guidelines talk about. The contrast is with, and this I think makes it most clear, doctors submitting claims to Blue Cross, other medical insurers, right? Where the doctor is an approved provider of the insurance company as well as a doctor for the patient. But here, he only got through the door because he was an approved person, had those proper credentials. Otherwise, they would have never accepted his signature. He had to be a doctor to do it. He had to have the credential as a doctor. And this goes to the special skill question also. We say he did not use his special skill. He had the title with which comes special skills, but for the reasons that Judge Fuentes just said, he wasn't using his special skills to make the claims harder to detect. But wasn't he using the credential that was the indicator that he had those special skills? Credential and not the skill. You have to use the skill. Isn't this similar to the U.S. v. Sherman case where the doctor had a relationship with an insurance company, the hypothetical that you're presenting? And that was found to be a position of trust, and of course, the doctor had special skills. It was found to be a position of trust because of the relationship with the insurance company, which here we don't have. And the special skill because what's being submitted there is a diagnosis, not the signing off on a form that transmits an echocardiogram reading. You actually have another. Right. Your time is running out. If you find the special skill, but not the position of trust, then the leader and supervisor adjustment also falls out. That's a four-level difference right there because under the guidelines, you can't get both. You can't get the skill adjustment and the leadership adjustment in the same case. If you don't uphold the skill adjustment, then you have to look at the leadership adjustment. And that one is, if I may have just a few seconds, is really quite simple. You have to lead another person who is criminally culpable. Only one person was named as having been led, organized, supervised by Dr. Tai, who was a sonographer who did some of these readings for him that he signed off on without looking at them. And there's no finding of her being a criminal. Well, can we say from the record, because Deborah Patrick was essentially signing off on all of these echocardiograms. No, you certainly can't make the finding. She knew that they were not being reviewed by the doctor. Only if no other finding, only if any other finding would be clearly erroneous could you possibly say that from the perspective of an appellate court, and that's not so. That's the job of the district court, or we cannot make that decision. That's right. At the very least, there's a critical finding that wasn't made for which a remand would be needed. I'd like to reserve the rest of my time. Mr. Goldberger, thank you very much. Thank you. Mr. Shapiro. Maybe you could do it a little bit backwards, if you don't mind, and go ahead and pick off where Mr. Goldberger left off on that aggravated role issue. May it please the court, my name is Paul Shapiro. I'm an assistant United States attorney. I do represent the United States in this case. I would be glad to do that. And in doing that, actually, I think I'm addressing the critical factor underlying all three issues, which is we're here on plain error. These were issues that, in the case of two, were never raised, and in the case of the third one, was waived, which is the Debbie Patrick issue was actually brought up by the defense as an objection to the PSR. The PSR pointed out that it was a factual issue for determination by the district court. And then when we get to sentencing, the defense withdrew the objection. Doesn't this qualify as plain error if a district court makes a mistake, resulting in additional time in prison for a defendant? Well, Your Honor, it depends on the nature of the mistake that the district court makes. And that assumes we get over the waiver hurdle. And really, the mistake that the defense is claiming is that the district court didn't make a finding. But it didn't make a finding that the defense told the district court it didn't have to make because the defense accepted the position of the PSR at sentencing. So to say to the district court and the government, you needn't prove X, Y, and Z, and then show up in the Third Circuit and say, oh, look at this horrible mistake. They didn't establish X, Y, and Z. Is it a matter of responsibility for the district court judge that is the sentencing judge? I mean, is it something that cannot be weighed because there has to be a finding? Not if the defense agrees. I mean, that's the whole purpose of having a pre-sentence report with numbered paragraphs and having objections and having the objections dealt with. And when the defense assures the district court and the government that this issue is no longer an issue, that the defense agrees with the factual findings of the PSR and the conclusions of the PSR, it is – well, that issue is A, waived. And they're not in a position to then say this critical – the district court erred in not making a finding. It's a – Well, if I may, I'm not sure what the – as I look at paragraph 54 of the PSR, which is the adjustment for the role in the offense, it does not include a statement about the criminal culpability, the intent or knowledge on the part of the employee, the technologist. It entirely focuses on Dr. Tai's knowledge and intent when he directed Ms. Patrick to read the echoes and then sign the reports that falsely stated that they were his conclusions. I agree with Your Honor. Even if you withdraw the objection, there isn't – still isn't any finding that the district court is adopting when the district court adopted the PSR. I agree that there isn't a finding, although if you actually – if you look at the objection at the – in the addendum to the PSR, this issue was squarely raised and then squarely – and presented for factual determination and then withdrawn so that what the defense is suggesting is that we arrive at sentencing and the defense says no objections to the PSR, Your Honor, and the government says, well, Your Honor, I feel like I want to respond to an objection that isn't being made. So what I'm suggesting is that even on plain error review, the error can't be the absence of a finding because the purpose of objections is to point out that a finding is needed. What I think this court certainly can do is look in the record and see if it was absolutely plain from the record that such a finding could not be made before – And that's – I like the answer to that. Where in the record can we find evidence to demonstrate that Ms. Patrick had criminal culpability in her actions to facilitate the submission of the echoes? There are actually two places. One is, as both parties pointed out in closing, the defendant's culpability was hand-in-hand with the culpability of the fen-fen stenographers. Really his crime was taking distorted numbers that were provided to him by the technologists and passing those numbers on. I thought Judge Schwartz was asking where in the record is there a finding of culpability? There – no, there is not a – there is not a – there is evidence from which a finding could be made. I understood – That's my question, yeah. So – Uh-oh. So you're talking about the closing, but where in the evidence? Who testified to that? Ms. Patrick's testimony through her deposition at trial suggests that she had every reason to think the doctor was reviewing these. Actually to the contrary. She did say that. She did say on the record, I thought he was reviewing them. But of course the district court at sentencing doesn't have to believe what she says she thought. Because remember, this problem is presented to her, as I pointed out to the jury in closing. Her boss comes to her and says, look, I'm too busy. I can't review all of these. I just don't have enough time. So here's a bunch. Would you do them for me? Now as she knows from being, A, a technologist, and B, otherwise involved in the fen-fen litigation, it is the doctor's job to review and approve them. And that review and approval is based on work done by the sonographer. So having her review it and then give it to him doesn't save him any time whatsoever. Is your argument that we should be making the decision of culpability on the basis of the record? My argument is that there is no plain error based – because such a finding would have been supported had it been asked for. There is no plain error on this record. But given her testimony that she thought they were being reviewed, and given the, as I understand it, the plausibility of an interpretation that there are lots of different ways of saving time in the process that you've described, ranging from not having to do your own paperwork to not doing any review at all and simply sending them on, it's a credibility determination that you're asking us, in essence, to make. And isn't that customarily something that we would ask the district court to do if we thought it needed to be done? You've packaged several questions in there. My answer to the first two are no, and the last is yes. And – Got it. So customarily, the district court does do it, but we're here in an uncustomary situation, which is, at best, plain error review, and at worst, waiver. At best for the defense, plain error, and at worst, waiver. Waiver of plain error. Well, waiver of any error. And so here we are in a situation of the defendant's making. So yes, it is normally a thing that the district court would do, but my view is that there cannot be plain error unless it is obvious from the record that no finding could have been made by the district court. So what I'm saying is if you can look at the record and say, well, the district court could have made such a finding, therefore, any error cannot be plain. How did that waiver come about, Mr. Shapiro? Could you go back over that again? Was it just that the defense counsel waived any of the requests for enhancements in the Or was it actually addressed by the judge in court? Well, my recollection of what happened is it was actually presented as an objection in the PSR, and if you look at the addendum, you can see the defendant's position and then the response of the probation office. Was it something like saying we have no objections to the request for enhancements in the pre-sentence report? Was it something like that? No, no, Your Honor. There was a specific objection made to paragraph 54 on the ground that this defense that Debbie Patrick believed that the defendant was rereading her echoes afterwards. And the PSR said, we don't accept that, but this is a factual issue that the district court will have to resolve at sentencing. We arrived, we the government arrived at sentencing prepared to address that on the record. When we got there, the defense withdrew that objection is my recollection of what happened. So the issue was teed up and parties were prepared to address it, and then the defense said it's not necessary to address it. And there's a rational reason for that. Tell me about that because as I'm listening to you and as I read the argument in the brief, it struck me that if we agree with your position on direct appeal, there's a giant ineffective assistance of counsel argument coming pretty quickly thereafter. Well, understand that Debbie Patrick was not the only potential person that Dr. Tye supervised in this case. It was as teed up in the PSR. And if the defense had no objections, the only thing on the line was supervising one. But there was evidence in the trial record and evidence available for a sentencing record if the government was in the position to make one, which is that while she was the only sonographer who worked directly in his employ, there were many, many sonographers who, although employed by others, were directed by him. And there was a tremendous amount of evidence that we actually put before the jury to show his knowledge and his intent that he would get bad reports from sonographers and he would call the sonographers or write to the sonographers and say, look, you can't do this. I won't have you submitting reports that look like this. You have to do this and you have to do that and you have to do the other thing. Might you want to address, you've got about four minutes left and you spent quite a bit of time on this issue. Did you want to address the other one? You can keep going if you like. It's your time. No, Your Honor, I would like to address the willful blindness issue as well. And again, take us back to the plain error issue. This is an instruction. We're here on plain error. So the first requirement is that the error was plain, obvious. This is an instruction that was put together by a group of judges and lawyers, prosecutors and defense counsel alike. This error, if it is an error, occurred to none of them. It then was obviously reviewed by this defense counsel, this prosecutor, and this judge. And this issue is one that occurred to none of them. And indeed, it is an issue that this court looked at in Flores. Because in Flores, the question was whether the willful blindness instruction, which was substantively identical, shifted the burden of proof. But isn't the question here not shifting the burden of proof, but lowering the government's burden of proof? Well, no. The argument is shifting the burden of proof. And what this instruction does on its face is not that at all. I mean, we're getting past the plain error issue. If you look at the challenged paragraph, it does what jury instructions frequently do, and indeed, what we do in the course of our work as lawyers. There is a general principle. And general principles are hard to absorb in the abstract. And so then you give specifics to explain how the general principle plays out. And this was indeed a pro-defendant paragraph. Because what this paragraph says is, here's the concept of willful blindness. You have to have two prongs. You have to knowingly, you have to be aware of a high risk of a fact. And you have to consciously disregard it. And in this context, these three things don't do it. They are not alone enough. Negligence doesn't do it. A disregard of a low risk or a medium risk doesn't do it. And having a good faith belief doesn't do it. And what that does is it does not shift the burden or change the government's burden. It tells the jury, here's the principle, here's how you get to it. And this doesn't do it, and this doesn't do it, and this doesn't do it. And that is an absolutely typical device that we use in many ways. I mean, indeed, if you think about the process of formulating a legal argument, you go and you find a case and a principle is set out. And then you find a bunch more cases. And you find a case that says, well, this is not sufficient, and this is not sufficient. And then you find one that says, okay, this is sufficient. And now you have a sense of what it is needs to be proved. And here, the jury was told time and time and time again that the government bears the burden of proof, that the government bears the, indeed, in this very instruction, was told the government bears the burden of proof. And it never changes. And so when they were told, here are three cases that don't satisfy in neutral language, the natural and logical, you could argue the only interpretation. But certainly the natural and logical interpretation is that the judge is doing what I just said, which is- Well, Mr. Goldberger's point is that if one of those three circumstances do not exist, then that would suggest to the jury, well, then you can find them guilty on these other circumstances. Not on these three, but you can find them guilty on any other circumstances that you find. I think that's his point, and it effectively, according to Mr. Goldberger, lowers the burden of proof. His point would be a great point, Your Honor, if the word only were there, as it is in his brief. But it's not. And indeed, if you look at our instruction for reasonable doubt, we say a reasonable doubt is the kind of doubt that would cause a person to hesitate to act. A trifling doubt is not sufficient. That, we say, a fanciful doubt is not sufficient. It's exactly analogous to what we're doing here. We're going to have to, you want to finish your last thought, and then we're going to go back to Mr. Goldberger? So, so my last thought on this is, there is not error at all. It is a, it is a perfectly appropriate instruction. But if there is error, it is the, the diametric opposite of plain error. It's a, a subtle error or a fanciful error, but certainly not one that can be corrected at this stage. Thank you, Mr. Shapiro. Mr. Goldberger? If the instructions had actually said, this, for example, would not be willful blindness, that, for example, would not be willful blindness, we wouldn't be here. The problem is that the court said, if you find, a finding requires a burden of, of proof. That's the difference. And we rely on, that's, that creates a direct, a contra, an internal contradiction in the instructions. We rely on the Supreme Court decision in Francis versus Franklin for how you address conflicts in jury instructions, which in the Third Circuit is U.S. versus Hernandez. Those are cases that we rely on in our brief, point out in the reply, that of all the things we say in our brief about this, it's the one thing that isn't even mentioned in the government's brief. With respect to the possibility of a waiver. We went forward on this. We didn't hide anything. If you look at our brief, page 43, in footnote 13, we describe how the defense counsel made this objection and then withdrew it. Not by surprise, standing up and in sentencing by sending the judge a letter before sentencing. I'm baffled as to why, but he did. And, and it shows on page 616 of the appendix, the judge saying, yeah, I received your letter, is that, did I understand it correctly? So this, that's, that's what happened. But we also point out that on pages 56 to 57 of the government's brief, they waived the waiver, and this is discussed in our reply. Page, footnote 7 of the reply, the government mentions the circumstances which might give rise to a waiver argument, and then says, but putting that aside, there was no error at all. The government never argues that there was a waiver of this point in their brief, and they disavow arguing. They don't cite a case, and that is called waiving the waiver, and it puts the case, the issue before you on its merits. Do you want to respond, though, to this waiver argument? Had, had they affirmatively argued it in writing, as they just did orally? How is that not a block to our action? What we suggest in the reply, and what I would say in all fairness is, that the consequence of that, where there is plain error, as Judge Fuentes was pointing out, would be a remand with directions to make a finding, rather than a remand for resentencing. It would be, it would go to the remedy that you would give, but it doesn't go to whether you would address the issue. It's nevertheless it's nevertheless a plain, a plain error. Thank you very much. Thank you very much. My pleasure. We'll take the case under advice.